**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ZOE VICTORIA PARKER,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| | **NO.  15-1910** |
| **ROBERT A. McDONALD, SECRETARY OF VETERANS AFFAIRS OF THE UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Zoe Victoria Parker brings this case against her former employer, the United States Department of Veterans Affairs (the "VA") claiming race discrimination, national origin discrimination, and reprisal for protected activity in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*., arising from her removal from employment at the Coatesville (Pennsylvania) Veterans Affairs Medical Center and related disciplinary actions. Defendant Robert A. McDonald, the Secretary of Veterans Affairs, has filed a motion for summary judgment on all of Plaintiff's claims.[1]  The motion shall be granted.

**I.    BACKGROUND**

**A.   Plaintiff's Employment with the VA**

Plaintiff began working at the Veterans Affairs Medical Center ("VAMC") in Coatesville, Pennsylvania in 2003.  J.A. 3.  By 2010, Plaintiff was a Social Work Associate tasked with assisting the two masters-level licensed social workers on unit 58B with patient care

---

[1] Plaintiff did not file a formal response to Defendant's motion for summary judgment.  Instead, she requested that the Court consider the numerous letters with attached materials that she has submitted during the course of this matter.  In light of Plaintiff's *pro se* status, these submissions have been considered and, to the extent that the documents constitute competent evidence, they have been included in the Court's analysis along with the materials in the Joint Appendix submitted by Defendant.

under the first-line supervision of Social Work Supervisor for Mental Health Claudia Hepler ("Hepler") and the second-line supervision of Social Work Executive Program Manager for Social Work Service Phyllis Hartman ("Hartman").  J.A. 377, 840, 1372.  Prior to 2010, Plaintiff filed seven EEO complaints against various VAMC supervisors, not including Hartman or Hepler.  J.A. 4.  She had also been removed from service in 2006, but was reinstated in 2007 by the Merit Systems Protection Board ("MSPB").  J.A. 79.  This prior activity is not at issue in this case.

### 1.  Conflict with Denise Holmes

Plaintiff's claims in this case arise primarily from the disciplinary actions the VA took in the aftermath of a conflict between Plaintiff and a co-worker, Recreation Therapist Denise Holmes ("Holmes").

### a.  Plaintiff's Initial Reports of Harassment

Plaintiff met with Hartman and Hepler twice in December 2010 to report that Holmes had been harassing her since 2008 – primarily by spreading rumors about Plaintiff's relationship with patients.  J.A. 1359.  Hepler and Hartman shared the allegations with Holmes's unit manager, Linda Knight ("Knight"), and supervisor, Jennifer Koehler ("Koehler"), who followed up by meeting with Holmes to discuss the incidents.  J.A. 1359, 1367.  Holmes responded with allegations of her own against Plaintiff.  J.A. 1367.  Following the meetings, Hartman and Hepler recommended to Plaintiff that she (1) guard against believing accusations against Holmes that are not proven; (2) not engage in workplace gossip; (3) report any problems with co-workers to Hepler; and (4) see an Employee Assistance Program (EAP) counselor to discuss her conflicts at work and how to better manage them.  J.A. 1360.  This initial advice did not resolve the conflict and, in May or early June 2011, Hepler told Plaintiff to avoid unnecessary contact with Holmes.

J.A. 426.  Plaintiff denies ever being told to avoid Holmes, but recalls that she was instructed to remain professional in her interactions.  J.A. 1638.

### b.   June 23, 2011 Incidents

The simmering conflict between Plaintiff and Holmes boiled over with three incidents on June 23, 2011.  The first, which involved a patient and occurred in the doorway to Holmes's office, led to Plaintiff and Holmes filing reports of patient abuse against each other.  The second and third incidents involved Plaintiff allegedly taunting Holmes in the laundry room and making derogatory remarks about Holmes to a patient on the unit in the sun room.

### i.   Doorway Incident

 All parties agree that around 9:00 a.m. on June 23, 2011, Plaintiff knocked on Holmes's closed office door accompanied by G.M., a veteran receiving treatment in unit 58B.  J.A. 90-93. When Holmes opened the door and saw Plaintiff, she said something to Plaintiff and G.M., and then closed the door.  J.A. 90-93.  The further details of this encounter remain opaque and disputed.  Holmes, Plaintiff, and G.M. gave differing accounts that were originally captured in a series of memoranda written by Knight after she met with each of them that day.  J.A. 1351-56. Plaintiff also discussed the matter with Hartman immediately after it occurred, and the VA police conducted an investigation which led to a formal police report.  J.A. 1375, 1772.

According to Holmes, she answered the door after Plaintiff knocked and told Plaintiff not to knock so loudly because it was disruptive.  J.A. 1357.  Plaintiff responded that G.M. wanted to talk to Holmes, and Holmes replied that G.M. could come to talk to her anytime and that she would speak with him later.  J.A. 1357.  Holmes then closed to the door to finish preparing for a coffee social.  J.A. 454.  G.M. approached Holmes after the social and told her that Plaintiff said Holmes was mad at him.  J.A. 453.  Holmes assured him that she was not.  J.A. 453.

Plaintiff maintains that G.M. initiated the visit to Holmes's office by telling Plaintiff that he wanted to apologize to Holmes for an earlier incident.  Plaintiff first recorded her account with a note that she made in G.M.'s chart shortly after the incident.  The note reads:

> Today, [G.M.] apologized to this worker; he stated that he was sorry and he did not know that the "government" takes these things seriously.  He also stated that he wanted to see Denise Holmes to tell her what he meant.  This worker and veteran visited Denise's office. When this worker knocked, Denise opened the door and Denise stated that "don't come knocking at my door; I know where to find you." Denise then quickly close [sic] the door.
>
> [G.M.] stepped away and stated that he did not want any trouble, he just wanted to let Denise know that he knew another man will be good for her.

J.A. 1366.  Plaintiff then contacted Hartman (Hepler was on vacation at the time).  She told Hartman her version of the incident, and, according to Plaintiff, Hartman told her that shutting the door on a patient sounded like patient abuse and that Plaintiff should report it to Knight.  J.A. 1192.  Hartman disputes this, however, and recalls that she told Plaintiff that Plaintiff, as the eyewitness, must decide for herself whether the incident was patient abuse and whether to report it.  J.A. 860.

In any event, after discussing the matter with Hartman, Plaintiff contacted Knight to report Holmes for patient abuse.  Plaintiff gave Knight a handwritten note that repeated verbatim the note in G.M.'s chart, followed by "Alleged Abuse: Ignoring of patient by Denise Holmes." J.A. 1389.  Knight's report of contact indicates that Plaintiff verbally told Knight that Holmes had "slammed" the door in a way that was "not a professional way to act," but Plaintiff's written statement and note in G.M.'s file do not describe the door closing as a "slam."  J.A. 1356, 1366.

After receiving Plaintiff's and Holmes's reports, Knight interviewed G.M.  J.A. 1353. G.M. told Knight that he did not ask Plaintiff to accompany him to Holmes's office, but rather that Plaintiff had told him that Holmes was mad at him.  J.A. 1353.  G.M. said that after Holmes

4

answered the door, she said "Hello," told him that he could talk to her anytime, and then closed

the door.  J.A. 1353.  According to G.M., Plaintiff then turned to him and told him that Holmes

had "slammed" the door and that it was inappropriate.  J.A. 1353.  G.M. did not agree that

Holmes had slammed the door, and told Knight that he "did not know what was wrong" with

Plaintiff, but "she was not acting right."  J.A. 1353.  G.M. said that he talked with Holmes later

in the day and learned that she was not mad at him.  J.A. 1353.

After taking Plaintiff's statement, Knight sent an e-mail to Koehler, Hartman, Hepler,

and Director of Mental Health Services Donna Primera indicating that "Zoe Parker has a

growing conflict with Denise Holmes that needs to be addressed."  J.A. 1366.  Knight also

reported the incident to VA police.  J.A. 1352.

## ii.  Other June 23, 2011 Incidents

Later on June 23, Holmes reported to Knight that Plaintiff had made sexually

inappropriate comments to her in the laundry room.  J.A. 1354.  A few hours later, Holmes filed

a third report with Knight, alleging that Plaintiff made derogatory comments about Holmes to

patient D.N.  J.A. 1355.  Knight interviewed D.N., who corroborated Holmes's report of the third

incident.  J.A. 1351.  Knight reported these incidents to her supervisor and VA Police.  J.A.

1352.

Plaintiff has consistently denied that either the laundry room or the comments to D.N.

occurred.  J.A. 1201.  When Hartman questioned Plaintiff about the incidents, Plaintiff refused to

give a written statement, but instead wrote, "Denise is a liar.  I need a union person present."

J.A. 1390.[2]

---

[2] Plaintiff has acknowledged under oath that the handwriting in the note is her own, but has voiced suspicion about the note, observing that the "R" in "liar" "doesn't look right" and appears to be overwritten.  J.A. 1280.  The underlying handwriting includes a lower-case "r," completing the word "liar," even without the overwritten "R." J.A. 1389.

### iii. Police Investigation

In response to Knight's report, the VA police investigated all three incidents.  J.A. 1375.

Holmes told the police that Plaintiff had been harassing her for weeks and gave the same account

to police that she gave to Knight.  J.A. 1376.  The police also interviewed Plaintiff, who

provided an account consistent with her own report to Knight.  J.A. 1377.  Both Holmes and

Plaintiff were advised to avoid further contact with each other.  J.A. 1376-77.  The police were

unable to interview G.M., but they did interview D.N., who corroborated Holmes's report

concerning Plaintiff's derogatory statements about Holmes.  J.A. 1376.

### 2.  Detail to Basement, Investigation, and E-Mails

The day after her incidents with Holmes, Plaintiff was transferred away from unit 58B to

an office in the basement of Environmental Management Services ("EMS").  J.A. 2146.

Hartman has testified that this assignment to a non-patient area was part of the normal operating

procedure during an investigation into allegations of patient abuse.  J.A. 2146.  On July 6,

Devansky convened an Administrative Investigation Board ("AIB") consisting of VA employees

Diane Stachowski ("Stachowski"), Sandra Stokes ("Stokes"), and Dellinah Deveaux

("Deveaux") to investigate the June 23 incidents.  J.A. 1349.

During Plaintiff's detail to EMS, while Hepler and Hartman were on vacation, Plaintiff

began e-mailing Medical Center Director Gary Devansky ("Devansky"), as well as Hartman's

supervisors Associate Director of Patient Care Services Rosemary Wharton ("Wharton"), and

Deputy Associate Director of Patient Care Services Nancy Mumma ("Mumma"), seeking more

information about why she was being investigated and reminding them that she had been

reinstated in 2007 after a prior attempt to remove her from service.  J.A. 1420-21.  Plaintiff also

mentioned that she had told a patient on the unit that her 2006 termination was not for sexual harassment, but rather was for refusing to hold a patient's jacket.  J.A. 1363.

Almost immediately, Wharton directed Plaintiff to stop e-mailing Devansky, and after Hepler and Hartman returned from vacation in early July, Hartman instructed Plaintiff to stop e-mailing Wharton and Mumma, and to instead direct her concerns to Hepler and Hartman.  J.A. 1274, 1420.  At the same time, Hartman cautioned Mumma, Wharton, and Hepler, "We need to proceed very carefully with Zoe, she must save all e-mails and archives from who she sees as 'management.'"  J.A. 1420.  Despite the instructions not to e-mail Devansky, Wharton, and Mumma, the messages continued.  J.A. 80, 1274.  Mumma later offered to meet with Plaintiff to discuss her concerns, but Plaintiff declined and instead sent another lengthy e-mail to Mumma and others, which she also threatened to forward to Devansky.  J.A. 1402.  In response, Wharton again directed Plaintiff "to stop sending e-mails to Mr. Devansky, me and other supervisors with your concerns related to this investigation. . . . You need to address your concerns to the staff who are conducting the AIB."  J.A. 80, 1402.

After the AIB began formal depositions in August 2011, Plaintiff added the AIB members to her e-mails, but continued to send the e-mails to Devansky, Mumma, Wharton, and an increasingly large set of VA officials.  J.A. 1414-15.  One such message was sent on August 11, 2011 and included a lengthy recapitulation of her responses to the various allegations against her, a request that Stokes be removed from the AIB due to vague "violations" of the Investigation Policy and Procedure, and another comment on the circumstances of Plaintiff's original removal from VA service in 2006.  J.A. 1414-15.  Five days later, on the morning of her own initial deposition before the AIB, Plaintiff sent another e-mail to Devansky, Stachowski, Hepler, and others under the subject "The investigation of What [sic] two in- patient [sic]

7

psychiatric patients reported to Mrs. Denise Holmes." J.A. 1417. Later that day, Hepler revoked

Plaintiff's access to the VA computer system as a result of her continued e-mails. J.A. 897,

1458. The next day, Plaintiff was issued a proposed reprimand for failing to follow instructions

not to send e-mails to the members of the AIB and other employees. J.A. 2184. The reprimand

was sustained and issued on September 23, 2011. J.A. 2184.

### 3. AIB Proceedings

The AIB investigation took place from July until November 2011, and included a review

of VA policies, e-mails, documents and other physical evidence, as well as dozens of sworn

depositions. J.A. 58.

#### a. Plaintiff's First AIB Deposition

During her initial testimony before the AIB on August 16, 2011, Plaintiff reiterated her

own version of the events of June 23, 2011 and denied the accusations that Holmes had made

against her in December 2010. J.A. 1185-1275. She also questioned the authenticity of the note

in which she purportedly wrote "Denise is a liar," by noting that the "liar look [sic] funny. I

don't think I call [sic] her a name." J.A. 1200-01. Plaintiff, who was born in Liberia, also made

allegations of discrimination during the deposition, expressing her belief that various accusations

against her dating back to 2004 were made, in part, out of national origin-based harassment on

the part of her United States-born co-workers, including EEO Manager Sandra Simmons

("Simmons"). J.A. 1231.

#### b. Plaintiff's Second AIB Testimony

After taking testimony from several other witnesses, including Hepler, Hartman, and

Holmes, the AIB called Plaintiff for a second day of sworn testimony, which she gave on

September 12, 2011. J.A. 1268. During this second day of testimony, Plaintiff testified that she

believed that Holmes's behavior during the doorway incident with G.M. was in a "gray area" bordering on patient abuse, and that Hartman had directed her to file the patient abuse report with Knight.  J.A. 1290-98.  Plaintiff also testified that she has "never had a problem with Denise," although Holmes "don't [sic] mind her own business, and she need to."  J.A. 1314.

Plaintiff reiterated her suspicions about the authenticity of the "Denise is a liar" note, again observing that the "R" in liar "doesn't look like it's supposed to be there," but ultimately Plaintiff would neither confirm nor deny writing the note.  J.A. 1280.  Plaintiff also questioned the veracity of the VA Police Report created on June 23, 2011 by suggesting that the officer did not actually interview patient D.N.  J.A. 1333.  Upon further questioning, Plaintiff hedged her testimony by saying she had "concerns" about whether the interview actually occurred.  J.A. 1335-37.

Plaintiff also repeated her belief that the allegations against her were the result of national origin-based discrimination.  She testified that "the black people call me African girl," and gave her perspective on the tension between foreign-born residents and the United States-born African-American community in Coatesville.  J.A. 1328-29.  She did not, however, give any examples of national origin-based slurs or comments made by specific VA staff members, nor did she connect any comments about her national origin to the adverse actions cited in the EEO complaints that she filed in the fall of 2011.

### 4.  Plaintiff's Grievance and Initial EEO Contact

Sometime before September 19, 2011, Plaintiff contacted an EEO counselor with concerns that her supervisors' treatment of her in the aftermath of the June 23, 2011 incidents was motivated by her race or national origin, or was in retaliation for her prior EEO activity. Additionally, on September 21, 2011, Plaintiff filed a union grievance against Hepler alleging

that Hepler's mandate that Plaintiff undergo a medical examination and drug test on September 2, 2011 violated the VA Master Agreement and federal regulations.  ECF No. 17 at 18.  A grievance meeting was held on October 7, 2011 with Plaintiff, Hepler, union representative Laurie Shannon-Bailey ("Shannon-Bailey") and HR Specialist Stanley Weller ("Weller") in attendance.  J.A. 1660.  According to Hepler, Plaintiff said at this meeting that Hepler was not a racist and was a nice person, but that Plaintiff had filed an EEO complaint against Hepler in an effort to save her own job.  J.A. 1660.  Hepler's Step 1 grievance response letter on October 13, 2011 did not mention any of these comments.  ECF No. 17 at 22.[3]  On November 12, 2011, Plaintiff escalated her EEO concerns with a formal EEO complaint, which initiated EEO Case No. 200H-0542-2011104813 ("EEO Case 104813").  J.A. 4.

In mid-October 2011, Plaintiff was transferred back to the Social Work Department to serve in an administrative role located in the basement of the unit because, according to Hartman, the head of the Education Department (where Plaintiff had been transferred from the EMS department) asked for Plaintiff to be relocated in light of more than 20 complaints from co-workers that Plaintiff was disruptive and interfered with their job tasks.  J.A. 2140, 2147.

### 5.  First Proposed Removal

On October 26, 2011, prior to the conclusion of the AIB investigation, Hepler issued a letter of proposed removal to Plaintiff based on conduct unrelated to the incidents under investigation by the AIB (the "First Proposed Removal").[4]  J.A. 201, 2100.  The First Proposed Removal listed four charges against Plaintiff:  (1) Patient Abuse and Violation of

---

[3] The grievance eventually proceeded to at least Step 3 under the Master Agreement.  ECF No. 17 at 25.  The record in this case does not indicate how the grievance was ultimately resolved.

[4] On October 21, 2011, Plaintiff e-mailed EEO Counselor Lydia Ward accusing Simmons of soliciting disciplinary "write ups" against Plaintiff from various VA staff.  J.A. 95.  Other than Plaintiff's e-mailed allegation, there is no evidence in the record that Simmons or any other VA supervisor sought out complaints against Plaintiff.

Employee/Patient Boundaries; (2) Inappropriate Conduct; (3) Failure to Follow Instructions; and (4) Lack of Candor.  Charge 1 was based on allegations that Plaintiff had taken a patient to Philadelphia dressed only in sheets, had given other patients favorable treatment regarding supplies, and that she had slept with both male and female patients.  Charge 2 was based on allegations that Plaintiff had told co-workers that Hartman intentionally humiliated Plaintiff, told a VA nurse she was "the crazy nurse and I'm the crazy social worker," confessed to a co-worker that she had allowed a patient to touch her inappropriately, accused a deceased co-worker of lying during a hearing and having inappropriate relationships with patients, and made unsubstantiated accusations of misconduct against the same co-worker.  Charge 3 concerned allegations that Plaintiff had disregarded an instruction not to discuss her AIB testimony with anyone by discussing her deposition with her acting supervisor.  Charge 4 was supported by the allegation that Plaintiff had lied to VA police during an investigation of the incidents cited in Charges 1 and 2.  J.A. 2100-02.  Plaintiff submitted a written response to the First Proposed Removal on November 17, in which she generally denied the substance of the allegations.  J.A. 2105-06.  Plaintiff also offered a verbal response on December 7, 2011.  J.A. 2111.

In November 2011, after the First Proposed Removal was issued, but before it was acted upon by Devansky, the AIB released its Finding of Fact and Conclusions (the "AIB Report"). The AIB Report recommended that Plaintiff receive "appropriate administrative action for her actions."  J.A. 59.[5]  Administrative action based on the AIB Report was deferred until April 2012, and Devansky proceeded to decision on the First Proposed Removal without consideration of the AIB's findings.  J.A. 1819.

---

[5] The full AIB Report was not submitted to the Court in this case.  The only portion in the record is the cover letter, which contains the AIB's recommendations.  J.A. 59.

On December 15, 2011, Devansky mitigated the First Proposed Removal to a 14-day suspension.  J.A. 2111.  In doing so, he sustained all specifications stated in Charges 2, 3, and 4, but did not sustain Charge 1.  J.A. 2111.  Devansky's written decision did not offer explanations for sustaining Charges 2, 3, and 4, nor a reason for not sustaining Charge 1.  J.A. 2111.  In later testimony, Devansky recalled that during Plaintiff's oral response, she alleged that "she was being harassed by many, many people at the Medical Center, you know, that she was being treated unfairly, but I didn't see any evidence of that."  J.A. 2131.  Rather, he concluded that Plaintiff had "little insight into what she had done, and she was not remorseful at all, and basically denied everything, all these, you know, pretty serious charges."  J.A. 2131.  Plaintiff was suspended from December 21, 2011 through January 3, 2012.  J.A. 2111.

### 6.  FMLA Leave, Disability Retirement, and Unemployment

During her suspension, Plaintiff began to apply for various forms of leave.  First, she requested 144 hours of advance leave, which Hepler denied because she was unsure if Plaintiff planned to return to work.  J.A. 2149.  Plaintiff then requested a year of Family Medical Leave Act ("FMLA") leave, of which 12 weeks were granted.  J.A. 2148.  Plaintiff also applied for state unemployment benefits, which were denied several months later because she was still employed.  J.A. 2133.  After the suspension ended on January 4, 2012, Hepler contacted Plaintiff to confirm that she planned to use her FMLA leave.  J.A. 2149.  Plaintiff said that she did, and her FMLA leave thus ran from January 4, 2012 until March 28, 2012.  J.A. 2149.  Although Plaintiff claimed in her EEO complaint that she was required to call in sick to the VAMC every day after January 4, Hepler testified that Plaintiff was not expected to check in on a daily basis after she confirmed her intent to use her FMLA leave.  J.A. 2149.  After Plaintiff's FMLA leave

ran out at the end of March, she began using her sick leave, until it also ran out, at which point

she remained absent from work on leave without pay.  J.A. 2153.

While on FMLA leave, Plaintiff applied for disability retirement from the VA.  Hepler

and Hartman approved submission of Plaintiff's retirement application to the Office of Personnel

Management ("OPM") and Plaintiff included letters of support from Dr. David J. Inman ("Dr.

Iman"), a VAMC psychologist who offered his medical opinion that Plaintiff's mental health

condition would make her unable to perform the functions of her job for the foreseeable future.

J.A. 43, 56, 2114, 2126.

### 7.  Second Proposed Removal

On April 23, 2012, while Plaintiff remained on leave, Hartman issued Plaintiff another

proposed removal from federal service (the "Second Proposed Removal") based mostly on the

AIB Report, and listing the following charges and specifications to support the removal:

Charge 1: Violation of Medical Center Policy, LD-19-09, Patient Abuse and
Employee/Patient Boundaries

Specification 1: On June 23, 2011 . . . you approached patient [G.M.] and told
him that employee Denise Holmes, Recreational Therapist, was upset with him.
You took him to see Ms. Holmes.  Ms. Holmes informed the employee[6] that she
was not upset with him and closed her office door and went back to work.  By
involving patient [G.M.] in an on-going staff disagreement, you violated the
patient's rights, thereby violating the Patient Abuse and Employee/Patient
Boundaries policy.

Specification 2: On June 30, 2011, you sent an email to [Wharton, Devansky, and
the EMS supervisor] in which you stated that you informed a patient on 58B that
you had not been fired in 2006 for sexual harassment, but that you had been fired
for not holding a patient's jacket.  Your excessive disclosure of personal
information is a violation of the Patient Abuse and Employee/Patient Boundaries
policy.

---

[6] It appears that "employee" here is a typographical error, and the Hartman intended to refer to patient G.M.

Charge 2: Filing false reports/statements

Specification 1: On June 23, 2011, you gave a handwritten note to [Knight].  In that note you allege that [Holmes] committed patient abuse when she slammed her door closed on patient [G.M.]. During sworn testimony before the AIB on September 12, 2011, you stated that you did not believe this was patient abuse but that [Hartman] told you it was patient abuse and you needed to report it.

Specification 2: On June 23, 2011 . . . you stated [to VA Police] that [Holmes] committed patient abuse when you slammed the door closed on patient G.M. During sworn testimony before the AIB on September 12, 2011, you stated that you did not believe this was patient abuse but that [Hartman] told you it was patient abuse and you needed to report it.

Specification 3: On October 7, 2011 . . . you stated to [Hepler, Weller, and Shannon-Bailey] that you knew [Hepler] was not a racist and that she is a good person, but that you needed to file an EEO complaint against her so you could save your job.

Charge 3: Violation of VA Directive 6001

Specification 1: The [AIB] determined that you willfully violated VA Directive 6001 on numerous occasions when you misused government equipment and sent emails to other staff members and the Board, accusing [Holmes] of alleged abuse and connecting her with those who create and spread false rumors.  You included this information in the subject line of your emails, which were unencrypted and sent to staff that did not have a need to know.

Charge 4: Lack of Candor

Specification 1: The [AIB] concluded that you did not provide credible and forthright testimony.  Examples of this are when you labeled your own handwritten statement, that you provided to your supervisor, as suspicious and when you stated you had concerns over a police report, which you questioned as to whether the police actually interviewed [D.N.].

J.A. 220-22.

Three days after the Second Proposed Removal was issued, Plaintiff contacted an EEO counselor to complain that the removal had been proposed in retaliation for her prior EEO activity.  ECF No. 16 at 16.  EEO counseling failed to resolve Plaintiff's concerns, and she filed a formal complaint on May 23, 2012 which initiated EEO Case No. 200H-0542-2012102850

("EEO Case 102850").  J.A. 169.  Meanwhile, on May 18, Weller informed Plaintiff that further

action regarding her removal was placed in abeyance until the resolution of her disability

retirement application.  J.A. 225.

### a.    Return to Work in September 2012

Plaintiff's retirement disability application was denied on September 13, 2012.  J.A. 36,

39.  On September 19, Plaintiff reported to work, allegedly unannounced.  J.A. 102, 202.

Hartman recalls that Plaintiff became very disruptive after arriving at the VAMC, and she was

eventually escorted to the Human Resources department by VA police, where Weller informed

her that the Second Proposed Removal was being reactivated.  J.A. 6.  Plaintiff was then taken to

the urgent care center for a physical.  J.A. 6.  Plaintiff alleges that she was denied a key to the

locked basement bathroom that day.  J.A. 173.  Hepler later explained that the entire VAMC had

been re-keyed while Plaintiff was on leave, and that Plaintiff could have used an unlocked

bathroom on the first floor until a set of keys was made for her.  J.A. 211.

The next day, Devansky placed Plaintiff on Paid Non-Duty Status, upon the

recommendation of her supervisors due to her allegedly disruptive behavior the previous day.

J.A. 207, 2163.  That same day, Plaintiff contacted an EEO counselor complaining that Hepler

and Hartman's treatment of her upon her return to work was in retaliation for her prior EEO

activity.  J.A. 3.  On September 26, Weller sent Plaintiff a letter advising her that she was

permitted to submit an oral or written response to her proposed removal no later than October 1,

and informing her of a meeting on October 1 to allow for an oral response.  J.A. 228.

### b.    Plaintiff's Response to the Second Proposed Removal

Plaintiff e-mailed her written response to the Second Proposed Removal on September

28.  J.A. 2170.  The response included several paragraphs that attacked the AIB process and

accused the AIB members of bias, as well as alleging that Hartman did not want to employ any Social Work Associates and was thus trying to avoid the court order reinstating Plaintiff after her prior removal had been overturned in 2007.[7]  J.A. 2170-71.  Plaintiff also denied the specific allegations and reiterated her belief that Hartman had instructed her to report Holmes for patient abuse on June 23, 2011.  J.A. 2171-73.

Plaintiff did not offer an oral response on October 1, and another meeting was scheduled for October 2.  J.A. 2173.  Plaintiff did not attend the October 2 meeting either, but instead sent an e-mail to 39 VA employees, including Devansky, Hartman, Hepler, Mumma, and Dr. Inman, under the subject line, "Gary Devansky, Director Coatesville VAMC continues to harass Zoe Parker to resign her GA 7 position: TELL HIM TO STOP HARASSING ME!!!!!!!"  J.A. 29.  In the e-mail, Plaintiff characterized the oral response meeting a "set up," and indicated that "I have nothing more to say.  I have written 10's of emails on this botch [sic] report."  J.A. 29.  Plaintiff also accused Devansky of "slandering" her based on the 2011 suspension, claimed that Weller "failed to give me over 90 percent of the evidence folder," and expressed the belief that the disability retirement application was a "set up."  J.A. 29-30.  Two weeks later, Plaintiff sent another e-mail to Devansky, Hepler, Hartman, and others complaining that Weller had called her again asking if she would like to offer an oral response.  J.A. 2176.  Plaintiff reiterated that she did not want to make an oral response, was still missing "90 percent of the evidence folder," and did not wish to report to the VAMC until after a decision on the proposed removal.  J.A. 2176.  EEO counseling did not resolve her concerns, and she filed another formal EEO complaint on October 10, 2012, initiating EEO Case No. 200H-0542-2012104774 ("EEO Case 104774").

---

[7] The Social Work Associate position was being phased out, and by 2012 Plaintiff was the only Social Work Associate still employed at the Coatesville VAMC.  J.A. 1784.

### c.   Final Decision on Removal

On October 25, 2012, Devansky sustained all charges cited in the Second Proposed Removal and directed that Plaintiff be removed from employment on November 2, 2012. J.A. 2177. Devansky's decision letter indicates that, after considering the numerous factors required in making a disciplinary decision under the federal merit employment system, he determined "that mitigation of the proposed penalty is not warranted and that the penalty of removal is appropriate and will promote the efficiency of the service." J.A. 2177.

### d.   MSPB Appeal

Plaintiff appealed her removal to the Merit Systems Protection Board ("MSPB"). An administrative judge conducted a two-day hearing during which Plaintiff represented herself. J.A. 1535, 1804. Plaintiff offered extensive commentary during her objections and cross-examinations, but ultimately declined to testify under oath or offer any witnesses on her own behalf. J.A. 1956. On December 11, 2014, the administrative judge affirmed the removal, although she did not sustain Charge 4 and one specification under each of the first two charges. J.A. 2006. Specifically, Charge 1, Specification 2, was not sustained because Plaintiff's explanation of the circumstances of her 2006 removal to a patient constituted an appropriate clarification of false information, and not a violation of staff/patient boundaries. J.A. 1996. Charge 2, Specification 1 was not sustained because Plaintiff's written report to Knight on June 23, 2011 that Holmes "closed" the door was consistent with Plaintiff's AIB testimony, and thus the report to Knight was not, strictly speaking, false. J.A. 1997. Charge 4 ("Lack of Candor") was not sustained because Plaintiff's observation of a handwriting irregularity and questioning whether the police actually interviewed D.N. were not objectively false statements. J.A. 1999.

17

Plaintiff appealed the administrative judge's decision to the full MSPB.  The MSPB issued a decision on April 6, 2015 affirming the removal, but modifying the administrative judge's analysis to find that Charge 2, Specification 2, could not serve as the basis for a false statement charge because there was insufficient evidence to show that Plaintiff's misstatement of Hartman's advice on June 23, 2011 was made with the intent to defraud, deceive, or mislead the agency.  J.A. 2571.

### B.   Treatment of Similarly Situated Employees

Plaintiff has cited social worker R.F. as a similarly situated employee who was allegedly afforded better treatment than Plaintiff.  R.F is African-American, and, according to Plaintiff, he was born in the United States and had no prior EEO claims in 2011.  J.A. 2680.  In 2011, R.F. was accused of making inappropriate physical contact with a patient at the VAMC.  J.A. 2551. After a four-month investigation, an AIB with different members than Plaintiff's AIB issued a Report of Investigation concluding that there was insufficient evidence to substantiate the allegations against R.F. and recommending that no administrative action be taken against him. J.A. 2562.  The AIB's Report of Investigation describes in great detail the contradictory testimony and lack of evidence to support the allegations against R.F., and notes that some of the specific the allegations against R.F. were not possible within the staffing structures in place at the Coatesville VAMC.  J.A. 2551-64.

### C.   Procedural History of Discrimination Claims

EEO Case 102850, which concerned only the Second Proposed Removal and asserted reprisal as the only basis for discrimination, merged with Plaintiff's MSPB appeal.  ECF No. 16 at 6.  The MSPB administrative judge found "that no evidence shows that the agency acted in reprisal against [Plaintiff] because of [her EEO] complaint."  J.A. 2003.  The full MSPB

affirmed this finding of no discrimination when it sustained Plaintiff's removal on April 6, 2015.

J.A. 2574-75.  Plaintiff timely filed suit in this Court four days later.[8]

EEO Case 104813, which asserted race (African-American), national origin (Liberian),

and reprisal as bases for discrimination and hostile work environment claims, was eventually

expanded to include the following fifteen incidents leading up to the Second Proposed Removal:[9]

1) Plaintiff's detail to the EMS basement on June 24, 2011;

2) The denial of Plaintiff's computer access on August 12, and 16, 2011;

3) The proposed reprimand issued on August 17, 2011;

4) On September 20, 2011, Plaintiff's supervisor failed to respond to Plaintiff's request to leave her work area;

5) The reprimand affirmed on September 23, 2011;

6) Simmons allegedly calling Plaintiff "crazy," and asking her supervisors and co-workers to file complaints against Plaintiff;

7) Plaintiff's detail from the Education Department to the Social Work basement on October 24, 2011;

8) The First Proposed Removal, issued on October 26, 2011;

9) The transfer of Plaintiff's personal possessions to the basement on November 16, 2011, allegedly in anticipation of Plaintiff's removal from service;

10) The two-week suspension issued to Plaintiff on December 14, 2011;

11) The denial of Plaintiff's request for 144 hours of advanced sick leave on December 20, 2011;

12) The alleged denial of "one year of family medical leave" on December 21, 2011;

---

[8] Upon the MSPB's final decision regarding an EEO claim, an employee may either file an appeal to the EEOC, or, within 30 days, file a civil action in federal court.  *See* 5 U.S.C. § 7703(b)(2).

[9] Plaintiff also stated claims arising from the mandatory drug test and psychological evaluation on September 2, 2011, but those claims were dismissed by the VA on procedural grounds, *see* J.A. 2181, and were not appealed to the EEOC.  J.A. 2739.

13) The charging of Plaintiff with two weeks of leave without pay during her two-week suspension;

14) The alleged requirement that Plaintiff call the VA daily to report that she was sick, beginning on January 4, 2012; and

15) The alleged denial of Plaintiff's request for FMLA leave from February 17, 2012 through April 5, 2012.

J.A. 2182-83, 2738-39.  The VA issued a Final Agency Decision on November 19, 2012, dismissing the case because Plaintiff failed to demonstrate a hostile work environment or direct discrimination.  J.A. 2199.  Plaintiff timely appealed to the EEOC.  J.A. 2738.  The EEOC affirmed the Final Agency Decision on July 28, 2015, and Plaintiff timely filed civil action 15-cv-4467 in this Court, which was consolidated with her earlier case.

EEO Case 104774 eventually included reprisal-based claims arising from four events following Plaintiff's return to work in September 2012:

1) On September 19, 2012, Hartman allegedly told VA Police that Plaintiff no longer worked at the VAMC and had her escorted to HR and then off the premises;

2) On September 20, 2012, Devansky issued Plaintiff a "Paid Non-Duty Status" letter;

3) On September 20, 2012, Hepler failed to provide Plaintiff with a working key to the restroom; and

4) On September 26, 2012, Weller sent Plaintiff a letter informing her that she could provide an oral response to her proposed removal.

J.A. 3.  After an investigation, the VA found that Plaintiff "believes that management was harassing her in the matters of the instant complainant [sic] in reprisal for her prior EEO activity, but she failed to provide any additional evidence in support of her belief."  J.A. 12.  Plaintiff requested a hearing on the matter with an EEOC administrative judge.  J.A. 2585.  Instead of a hearing, the EEOC administrative judge dismissed the case on procedural grounds as being identical to the issues raised before the MSPB.  J.A. 2585.  The VA reviewed the dismissal and

20

concluded that it was factually and legally correct in a Final Agency Decision on February 3, 2016.  J.A. 2585-87.[10]  Upon receipt of this Final Agency Decision, Plaintiff timely filed civil case 16-cv-774 in this Court, which was consolidated with her two earlier-filed matters.

## II.    LEGAL STANDARD

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'"  *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. P. 56(c)).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  A fact is material if it might affect the outcome of the suit under the governing law.  *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).  In deciding a motion for summary judgment, "[t]he reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence

---

[10] The Final Agency Decision notes that, while the allegations about the oral response were not specifically placed before the MSPB, the administrative judge's dismissal of the case was proper since "[n]otice of the opportunity to respond to a proposed action cannot sensibly be viewed as a personnel action. . . . Nor would this action deter a reasonable person from engaging in EEO activity."  J.A. 2585.

on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*).  In other words, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26).  In making this showing of a genuine dispute, "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F. 3d 660, 666 (3d Cir. 2016).

## III.    DISCUSSION

Plaintiff has not specifically indicated which incidents provide the basis for her claims in this Court, so the Court will assume that she is advancing all claims set forth in EEO Cases 102850, 104813, and 104774.  Title VII claims such as Plaintiff's must be analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (applying *McDonnell Douglas* framework to Title VII retaliation claims); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (applying *McDonnell Douglas* framework to Title VII discrimination claims).  Under the *McDonnell Douglas* framework, the Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Daniels*, 776 F.3d at 193.  If a *prima facie* case is established, the burden of production shifts to the defendant to present a legitimate, non-discriminatory reason for its actions.  *Id.*  If such a reason is proffered, the burden shifts back to the plaintiff to demonstrate pretext – that "the employer's proffered explanation was false, and that retaliation [or discrimination] was the real reason for the adverse employment

action." *Id.* (internal quotation marks omitted).  Although the burden of production of evidence shifts, "the plaintiff has the ultimate burden of persuasion at all times."  *Id.*

## A.   Retaliation

### 1.   *Prima Facie* Case

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must produce evidence of "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  *EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d Cir. 2015) (internal quotation marks omitted).

#### a.   Plaintiff's Protected Activity

Plaintiff has demonstrated that she engaged in activity protected by Title VII.  It is undisputed that she filed ten EEO complaints prior to or simultaneous with the alleged adverse actions cited in her EEO complaints.

#### b.   Adverse Employment Actions Against Plaintiff

For the purposes of a Title VII retaliation claim, an employer's action is "adverse" if the action "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  In other words, in a retaliation case, "adverse actions" are not limited to actions that affect the terms and conditions of employment, but also include actions that may discourage a reasonable worker from asserting his or her Title VII rights.  *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006).

Plaintiff has failed to provide evidence that several of the adverse actions cited in her EEO complaints actually occurred.  Specifically, there is no evidence (other than Plaintiffs' own

23

allegations) that Plaintiff's supervisor ignored Plaintiff's request to leave her work area on September 20, 2011 or that Simmons called Plaintiff "crazy" and solicited complaints against Plaintiff in October 2011.  There is also no evidence, other than Plaintiff's unsupported allegations, that she was required to report that she was sick every day after January 4, 2012. Rather, Hartman's testimony clarified that Plaintiff was required to inform the VA that she intended to use her FMLA leave on that date, but was not expected to call in on a daily basis once it was confirmed that she was using the full 12 weeks of leave.  Plaintiff has also alleged two actions that, even though they occurred, are not adverse actions because they could not dissuade a reasonable employee from pursuing her Title VII rights: informing Plaintiff of her right to orally respond to the Second Proposed Removal and moving Plaintiff's personal belongings to her new work station.

The remainder of the adverse actions alleged by Plaintiff are factually and legally supported: her detail to the EMS basement, the denial of her computer access, the formal reprimand, the suspension and the corresponding leave without pay, the transfer back to the Social Work Department to serve in the basement, both proposed removals, the denial of various leaves requests, the police escort to HR, the alleged withholding of the bathroom key, and the eventual removal from government service.  Since these actions could discourage a reasonable employee from EEO activity, they constitute adverse actions in a Title VII retaliation case.

### c.    Causal Nexus

Absent direct evidence of discrimination, a causal nexus between protected EEO activity and adverse actions can be shown, for the purpose of a *prima facie* case, through an "'unusually suggestive' proximity in time between the protected activity and the adverse action" in some circumstances.  *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 301 (3d Cir. 2007).  Other

evidence of discrimination, "such as actual antagonistic conduct or animus against the employee" may also provide evidence of a connection between the protected activity and the adverse action. *Id.*

While there is no direct evidence of retaliatory animus directed toward Plaintiff in this case, there is an unusually suggestive temporal proximity between Plaintiff's EEO activity and several of the alleged adverse actions taken against her, including her removal. Most of the VA's alleged adverse actions occurred either while Plaintiff was simultaneously engaged in the EEO counseling process or within six months after Plaintiff filed a formal EEO complaint against Hepler and Hartman.[11] Particularly given that the disciplinary actions escalated as Plaintiff pursued new EEO complaints, there is support for the *prima facie* inference that these actions were an attempt to either discourage future EEO complaints, or prevent further EEO complaints by ending Plaintiff's federal service.

### 2. Legitimate Non-Discriminatory Reason

Defendant has articulated legitimate non-discriminatory reasons for all of the adverse actions alleged in Plaintiff's EEO complaints. Plaintiff's detail to the EMS basement was a standard procedure pending the outcome of a patient abuse investigation. The denial of Plaintiff's computer access and the related reprimand were a result of Plaintiff's repeated violation of direct instructions to stop sending widespread e-mails concerning the allegations against her and her allegations against Holmes. Plaintiff was detailed from the Education Department back to the Social Work Department after complaints of disruptive behavior that interfered with Education Department business. Plaintiff's 14-day suspension was based on

---

[11] To the extent that the earliest adverse actions cited in this case occurred before Plaintiff filed her first EEO claim against Hepler and Hartman, there is evidence in record that Hartman and Hepler were aware of Plaintiff's pre-2011 EEO activity based on Hartman's specific instruction to carefully document all interactions with Plaintiff, which occurred shortly after June 23, 2011.

Devansky's conclusion that Plaintiff had engaged in inappropriate conduct, failed to follow instructions, and demonstrated a lack of candor.  Plaintiff was denied the equivalent of 18 work days of advance leave because Hepler was unsure that Plaintiff would ever return to work. Plaintiff's request for one year of FMLA leave was denied because the FMLA provides for only 12 weeks of leave.  *See* 29 U.S.C. § 2612(a)(1).  The Second Proposed Removal (and eventual removal from service) was based on the AIB's findings, the allegation that Plaintiff made false statements to the AIB, and the allegation that Plaintiff admitted to filing a false EEO complaint. Plaintiff was removed from VA property on September 19, 2012 and placed on Paid Non-Duty status pending the outcome of the Second Proposed Removal because she had been disruptive when she arrived at work that day, allegedly unannounced.  Finally, Hepler did not provide Plaintiff with a working key to the bathroom in September 2012 because the entire VAMC had been rekeyed while Plaintiff was on leave, and there were no copies of the basement bathroom keys available for immediate distribution.

### 3.  Pretext

To defeat summary judgment when the defendant has responded with a legitimate, non-discriminatory reason for its action, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

When a plaintiff offers no affirmative evidence of discrimination but instead relies entirely on demonstrating the weakness of an employer's proffered reasons to show pretext, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder

reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Id.* (internal citations omitted). The inquiry is not whether the employer was "wise, shrewd, prudent, or competent," but rather whether the proffered reasons are so implausible that a factfinder could rationally believe that they were not, in fact, the true reasons for the employer's action. *Id.* Accordingly, it is not enough for a plaintiff to "simply show that the employer's decision was wrong or mistaken," but instead the "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 765 (internal quotation marks and citations omitted).

Plaintiff's effort to demonstrate pretext in this case amounts to the allegation that her supervisors sought to discipline her and eventually remove her from service, and conspired with others to create reasons to justify their actions. She has not pointed to any direct evidence of this retaliatory motivation or conspiracy. Instead, her pretext argument relies on demonstrating irregularities in the VA's explanation for its actions.

The alleged irregularities cited by Plaintiff, even if true, fall far short of undermining the VA's proffered reasons. Plaintiff's ultimate removal from federal service was based on the findings of the AIB, after considering the testimony of numerous witnesses and the statements given by multiple patients. Plaintiff has alleged only minor discrepancies which, even if true, leave intact the majority of the VA's rational for the removal. As her primary factual dispute, Plaintiff maintains that she did not report Holmes for "slamming" the door in patient G.M.'s face, but rather reported that Holmes closed the door quickly. She argues that the VA

exaggerated her report to use it as a basis for her removal, which would suggest pretext.  But even assuming that Plaintiff did not actually accuse Holmes of "slamming" the door, this fact would not undermine the AIB's ultimate conclusion that Plaintiff committed patient abuse by involving G.M. in her ongoing conflict with Holmes, nor would it undermine the gist of the AIB's conclusion that Plaintiff filed a report of suspected patient abuse that she knew was unfounded.

Plaintiff has also questioned the soundness of the entire AIB process by alleging a conspiracy to "botch" the investigation.  In support of this allegation, Plaintiff contends that she was not allowed to cross-examine witnesses and alleges that "90 percent" of the evidence against her was withheld – but she has offered no evidence that she had a right to cross-examination or that evidence was actually withheld, nor has she explained how *any* allegedly withheld evidence would undermine the conclusion reached by the AIB after interviewing numerous witnesses and considering all known contemporaneous accounts of the events of June 23, 2011.[12]   In other words, Plaintiff has failed to offer evidence that the AIB proceedings were corrupted or irregular in any way, let alone evidence that the AIB was so unreliable that basing the Second Proposed Removal on the AIB's findings is evidence of pretext.

Plaintiff's final argument concerning the AIB process is that her AIB was handled differently than R.F.'s, and that R.F. was not terminated despite facing serious allegations at the same time that Plaintiff's AIB was conducted.  However, there is a straightforward explanation for why R.F. faced no discipline:  he was cleared of the charges by his AIB.  R.F. was subjected to substantially the same AIB process as Plaintiff – several witnesses were interviewed under

---

[12] It appears that Plaintiff's concern with withheld evidence may focus on evidence relating to the various charges made against her by Holmes in 2010, which Plaintiff has repeatedly characterized as "rumors."  Since these allegations were never cited as the basis for any disciplinary action, the AIB's consideration of these allegations is not relevant for Plaintiff's claims in this case.

oath and the AIB issued an opinion reconciling inconsistent testimony.  The fact that R.F. was cleared of the charges by the AIB while the charges against Plaintiff were sustained does not demonstrate that Plaintiff was treated differently.

Turning to the non-AIB-related specifications in the Second Proposed Removal, Plaintiff has denied that she called Hepler "nice" or that she admitted to filing a false EEO complaint.  To corroborate her denial, she has noted that none of the letters concerning the grievance process mention these statement by Plaintiff, and she has argued that Hartman's accepting of Hepler's and Weller's account of the meeting was unwarranted, which thus suggests pretext.  But Plaintiff has never offered an alternative version of the meeting, other than to flatly deny the statements and to argue that she would never call Hepler "nice" because she did not like Hepler.  She has therefore failed to show that it was unreasonable for Hartman to credit Hepler's and Weller's account (which was repeated by Hepler under oath before the MSPB).[13]  In sum, regardless of whether Plaintiff actually called Hepler "nice" or admitted to filing a false EEO complaint, Plaintiff has failed to show the type of implausibility or irregularities surrounding these allegations that would suggest that Hartman's reference to the incident in the Second Proposed Removal was pretextual.

To further argue that the grounds for her removal were pretextual, Plaintiff notes that three of the original specifications listed in the Second Proposed Removal were reversed by either the MSPB administrative judge or the full MSPB.  But the fact that these specifications were reversed does not show that they were pretextual; the reversals merely clarify that the specific incidents did not rise to the level of formal misconduct under MSPB precedent.  And

---

[13] Plaintiff chose not to testify before the MSPB, leaving Hepler's account of the October 7, 2011 uncontested for purposes of the MSPB proceedings.

even after the administrative reversals, three of the disciplinary charges against Plaintiff remained supported by at least one sustained specification.

Plaintiff also fails to provide the factual basis to support an inference of pretext with respect to the actions that preceded her removal.  Regarding the loss of her computer privileges and reprimand for e-mail abuse, Plaintiff claims that she received contradictory instructions, but the record contains several unequivocal directives to stop sending widespread e-mails about her case.  Furthermore, Plaintiff's computer privileges were revoked immediately following a violation of this directive, and there is no evidence that these actions were based on anything other than Plaintiff's continued refusal to follow instructions.  With respect to the First Proposed Removal, Plaintiff has criticized the VA for crediting the testimony of other employees over her own, but she has not identified evidence that the allegations were false or that it was unreasonable or suspicious to believe the testimony of multiple other employees over Plaintiff's own denials.  Plaintiff has also failed to introduce evidence of pretext with respect to the other adverse actions: There is no evidence to suggest that her various leave requests were denied for any reason other than those cited by the VA (*i.e.*, limiting FMLA leave to the statutory period of 12 weeks and refusing to grant advance leave because Plaintiff's future employment status was unclear) and there is no evidence that the VA's response to Plaintiff's return to work in September 2012, including a police escort to HR and placement on Paid Non-Duty Status, was motivated by anything other than Plaintiff's behavior on September 19, 2012 and a desire to avoid further conflict until the Second Proposed Removal was decided.  In sum, Plaintiff has failed to offer anything more than vague allegations of pretext, supported only by her own suspicions of retaliatory motive.  She has thus failed to show a genuine issue of material fact as

to pretext, and Defendant's motion for summary judgment on Plaintiff's claims of Title VII

retaliation shall be granted.

### B.   Race and National Origin Discrimination

To establish a *prima facie* case of race- or national origin-based discrimination, a plaintiff

must show that she: (1) was a member of a protected class; (2) was qualified for the position; (3)

suffered an adverse employment action; and, (4) the circumstances of the adverse employment

action imply discrimination.  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).

There is no dispute that Plaintiff is black and of Liberian national origin, that she was

qualified for her position as a social work associate, or that she suffered at least one adverse

employment action.[14]  However, Plaintiff has offered no evidence to support the inference that

any of the alleged adverse actions taken against her were motivated by her race or national

origin.[15]  The record contains no evidence (or even allegations) of any race-based animus against

Plaintiff.  With respect to national origin, Plaintiff has alleged that Holmes, Simmons, and other

unidentified VA employees harbored animus toward her because Plaintiff was born in Liberia,

but Holmes and Simmons was not responsible for the adverse employment actions against

Plaintiff.  Plaintiff has not pointed to evidence that Hepler, Hartman, Weller, Devansky, or any

other supervisor harbored national origin-based bias against her, let alone that such bias

motivated the adverse actions cited by Plaintiff.  Plaintiff has thus failed to make out a *prima*

---

[14] Unlike the broad category of adverse actions in the context of a retaliation claim, an adverse action for the purpose of a discrimination claim includes only those actions which effect a "'significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits.'"  *Weston v. Pennsylvania*, 251 F.3d 420, 430-31 (3d Cir. 2001) (quoting *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 749 (1998)).  Plaintiff did not include her removal as an adverse action in EEO Case 104813, which is the only complaint in which she complained of race and national origin discrimination, but she did cite her two-week suspension, and such suspensions have been held by the Third Circuit to be adverse action.  *See id.* at 431.

[15] During her deposition for this case, Plaintiff repeatedly refused to specifically identify evidence of race or national origin discrimination, but instead referred generally to "the evidence," vowed to "give [the Court] all the folders," and said she would leave the determination of discrimination "up to the jury."  J.A. 2670, 2672.

31

*facie* case of discrimination on the basis of race or national origin, and Defendant's motion for summary judgment on Plaintiff's race and national origin discrimination claims shall be granted.[16]

### C. Hostile Work Environment

To prevail on a hostile work environment claim, a plaintiff must establish that: "1) [she] suffered intentional discrimination because of [her protected status]; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person in like circumstances; and, 5) the existence of *respondeat superior* liability." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

Plaintiff's hostile work environment claims fail because, as discussed above, she has not provided evidence that the actions cited in her complaints were intentional discrimination based on her race, national origin, or prior EEO activity. Specifically, Plaintiff has failed to make out a *prima facie* case that any of the actions were motivated by her race or national origin and, although she has made out a *prima facie* case of Title VII retaliation, the VA has articulated legitimate non-discriminatory reasons for each of its adverse actions and Plaintiff has failed to introduce evidence that those reasons served as pretext for retaliation. Since Plaintiff has failed to provide evidence that the allegedly hostile actions constituted intentional discrimination or retaliation, Defendant's motion for summary judgment must be granted with respect to Plaintiff's hostile work environment claims.

---

[16] Even if Plaintiff could make out a *prima facie* case of national origin or race discrimination, summary judgment for Defendant on those claims would be warranted because, as discussed above in the context of retaliation, the VA has offered legitimate non-discriminatory reasons for its actions and Plaintiff has failed to show that those proffered reasons are pretextual.

**IV.      CONCLUSION**

Even adopting Plaintiff's version of the disputed facts, a factfinder could not reasonably conclude that the VA's disciplinary actions toward her were the result of unlawful discrimination or retaliation.  Defendant's motion for summary judgment shall therefore be granted.

Dated:  July 6, 2016

<div style="margin-left:50%">

**BY THE COURT:**

**/s/ Wendy Beetlestone**
_____
**WENDY BEETLESTONE, J.**

</div>